UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

MARIA FRONTERA,

                           Plaintiff,

              -vs-                                    07-CV-563C

SKF USA, INC., et al.,

                           Defendants.

_____

In this action, plaintiff Maria Frontera seeks damages and equitable relief against her former employer, SKF USA, Inc. ("SKF")[1] based upon alleged violations of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq.*; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*; and New York Human Rights Law ("NYHRL"), N.Y. Exec. L. § 296, *et seq.* Defendant has moved for summary judgment dismissing the complaint.

For the reasons that follow, defendant's summary judgment motion is granted.

## BACKGROUND

Plaintiff was hired by SKF in 1996 as a cost accountant for its manufacturing plant in Jamestown, New York (Manno Aff., Item 17-3, ¶¶ 2, 3). In 1999, plaintiff was diagnosed with Sjogren's Syndrome, a chronic autoimmune disease with symptoms similar to Lupus (Frontera Aff., Item 25, ¶¶ 8, 9). Certain environmental factors such as florescent or UV lights, dry air, and airborne pollutants aggravate the plaintiff's condition (*id.* at 10). From

---

[1] Also named as defendants are SKF Aeroengine Company and MRC Bearings, described in defendants' corporate disclosure statement as "operating divisions of SKF USA, Inc." (Item 6). The court will refer to these entities collectively as "SKF" or "defendant."

the onset of her condition through November 2004, plaintiff was able to control her symptoms by wearing hats and sunglasses to work, turning off the florescent lights above her work cubicle, and making other adjustments to her work environment which were approved by SKF (*id*. at 15-20).

In 2003, SKF announced its intention to close the Jamestown manufacturing facility, which resulted in a reduction in the work force and the eventual sale and lease-back of the building in which plaintiff worked. The sale took place in November 2004, and the Accounting Department was relocated in early December from the third floor to the second floor, where the Information Services ("IS") Department was also located (Item 17-3, Manno Aff., ¶¶ 5-10, 14). Prior to the relocation, plaintiff sent her supervisor, John Manno, an email indicating that she would prefer to remain in her old office but, "[i]f not, should we discover that my new location . . . becomes problematic, I am confident the company will make every effort to accommodate me then." (Item 17-7, Ex. 9.) Mr. Manno advised plaintiff that her department had to move because the building had been sold, and that she would be better able to control her working environment in the new location (Manno Aff., ¶ 12).

Plaintiff alleges that she immediately felt sick upon moving to the new office area, and became "sicker with each passing hour" (Item 25, Frontera Aff., ¶ 30). Mr. Manno arranged to have the florescent lighting in the new work space turned off, and desk lamps were provided. There was also a cover placed over the window near plaintiff's desk to block the lighting emanating from an adjoining office area, and a humidifier was installed (*see* Item 17-3, ¶ 15). When SKF's Nurse Laura Riley spoke with plaintiff on

December 20, 2004, plaintiff told her that "the area was working ok since some accomodations [sic] were made." (Item 17-7, Ex. 19.)

On January 6, 2005, plaintiff sent Human Resources Supervisor Sandy Martin an email indicating that the work space was too dark for the other employees, and requesting that "some serious thought be given to locating me in an area where I can control the lighting and environment without disrupting others." (*Id.*, Ex. 11.) Ms. Martin replied that she was working on it (*id.*, Ex. 12). The next day, Ms. Martin emailed plaintiff asking for medical documentation of her condition, stating: "[i]n order to make sure that our responsibilities are fully met under the ADA, please make sure that your physician specifies what reasonable accomodations [sic] should be in place to provide you with proper accomodations [sic] to remedy this situation." (*Id.*, Ex. 13.)

SKF's "Record of Medical Department Visits" indicates that on January 13, 2005, Nurse Riley visited plaintiff's new work area to address plaintiff's complaint that the move to the third floor "has upset [plaintiff's] working climate . . . ." (*Id.*, Ex. 8.) Plaintiff advised Ms. Riley that she suffered from Sjogren's Syndrome, and that her symptoms had become more severe after the move because she was unable to control her work environment. Ms. Riley advised plaintiff "to have her Dr. provide us some medical documentation and we [w]ill go from there." (*Id.*)

In a letter dated January 14, 2005, Dr. Leonard Calabrese reported that plaintiff had been under his care for Sjogren's disease since 1999. He indicated that plaintiff's symptoms included "light sensitivity, muscle aches, fatigue, and lethargy" which could be influenced by her work environment, and he "encourage[d] the HR department to make

every effort" to accommodate plaintiff (*id.*, Ex. 24). Dr. Calabrese did not otherwise specify any particular accommodations necessary to address plaintiff's workplace requirements.

Also on January 14, 2004, Ms. Riley reported to Ms. Martin that she had evaluated plaintiff's work area in light of the medical information received from Dr. Calabrese, and stated that she did not believe it was "possible to accommodate this problem in the current location." (*Id.*, Ex. 17.) Ms. Riley recommended that plaintiff be moved to a work area where she could control her environment without causing further disruption to other workers (*id.*).

Meanwhile, plaintiff stayed home from work that day (Friday, January 14), indicating by voice mail that she was ill and was unable to work in her current office (*id.*, Ex. 8). On Monday, January 17, plaintiff emailed SKF's Director of Finance, Terry Papincak, reporting that she had outpatient bladder surgery that day and "will be in as soon as a suitable workplace is made available." (*Id.*, Ex. 18.) She also advised Mr. Papincak that the reason she had recently missed several days of work was "because my work area makes me very sick." (*Id.*)

On Wednesday, January 19, plaintiff was evaluated by Dr. Conner, SKF's company physician, to determine her medical work restrictions. Dr. Conner recommended a work environment with employee control of lighting, heat, air quality, and climate (*see id.*, Ex. 8).

Also on January 19, Mr. Manno responded to plaintiff's email to Mr. Papincak, stating that he found plaintiff's characterization of her work area "insulting" (*id.*, Ex. 21):

> I would never let a solution to a problem be to let a person get sick. I was never aware that you had gotten to a serious health state until Friday morning when you called. I knew that the lights were an issue and one that we had worked out. I also knew that there could be other work environment

concerns but I did not know nor did you communicate to me that it was [a]ffecting you to the point that you got to on Friday.

(*Id.*)  He advised plaintiff that a small private office was being prepared for her use, and should be ready for her that day.  The office was 10' x 10', and was equipped with controllable baseboard heating, desktop lamps, light filtering blinds and curtains on an outside window, a space heater, and a cool water humidifier (Item 17-3, Riley Aff., ¶ 24).

Plaintiff returned to work on January 20, 2005, and advised Ms. Riley by email that the new office space "is going to be much better I am sure."  (Item 17-7, Ex. 22.)  She complained about her knees aching and her fingers swelling, but those symptoms had diminished by the next day (*id.*).  Ms. Riley advised plaintiff to keep her "up to date" (*id.*).  On February 3, plaintiff informed Ms. Riley that her symptoms were "not as bad . . . ," and "[b]eing out of the light and away from the other environmental factors . . . are lifesaving and 'job preserving' for me."  (*Id.*, Ex. 23.)

Meanwhile, Dr. Calabrese sent a letter dated January 26, 2005, and addressed "To Whom It May Concern," in which he reported that plaintiff was having "moderate complications from Sjogren's syndrome," and requested that plaintiff be given a week off to recuperate (*id.*, Ex. 24).  According to Mr. Manno and Ms. Riley, this letter was received by SKF's Human Resources Department sometime during the first week of February 2005 (*see* Item 17-3, Manno Aff., ¶ 29; Riley Aff., ¶ 29).  As a result, on Monday, February 7, 2005, Ms. Riley sent plaintiff a letter stating as follows:

> At this time you are not to return to work until such time that your treating physician states in writing that you are allowed to work safely in an office environment with reasonable accommodation for your medical condition during normal working hours.

> Enclosed you will find a Short Term Disability form with instructions for completion. Also enclosed are [Family and Medical Leave Act] papers with instructions for completion.
>
> Again, if you think of something that we can alter or add to the office space that has been designated your office, please feel free to let me know.
>
> We hope you are soon well enough to return to work. Please call us as soon as your doctor feels you can return to work and we will go from there.

(*Id.*, Ex. 26.)

On February 22, 2005, Ms. Riley wrote Dr. Calabrese, describing in detail plaintiff's new office space and requesting that he provide specific recommendations on how to accommodate plaintiff if the company's modifications were insufficient (*id.*, Ex. 28). Dr. Calabrese responded by letter dated April 21, 2005, stating as follows:

> Upon [plaintiff]'s return to work May 1, 2005, please make every effort to locate her in an office or area that can be configured and furnished with the following:
>
> • Office or work area that has been well-vacuumed and cleaned
> • Office or work area without direct fluorescent lighting
> • Office or work area with control of overhead and area lighting
> • Office or work area away from direct sunlight
> • Office or work area away from plant emissions
> • Office or work area away from multiple computers
> • Ultra-low radiation computer monitor
> • Humidifier
> • Air cleaner

(*Id.*, Ex. 29.)

Plaintiff saw Dr. Conner on April 27, 2005, and was approved to return to work with "restriction of environmental control of [her] work area" (*id.*, Ex. 8). She returned to work on Monday, May 2, 2005, and reported to Ms. Riley that "[t]hings are going well." (*Id.*, Ex. 31.) On May 16, she reported to Mr. Manno that, "[t]hough my new location is much

improved compared with my first location, and the Dell monitor and ray screen do make a difference, my new office continues to provoke my immune system, thus flares from my Sjogren's continue." (*Id.*, Ex. 33.)

Plaintiff continued to work until September 2005. On September 5, she emailed Mr. Manno from home stating as follows:

> Please contact Laura Riley to find out what I should do. I have not been feeling well. In order for me to feel well, I have to take my medication properly. Unfortunately I can't do that and come to work. With my illness, I need to sleep and my medicine allows me to do that. Without the medicine I do not sleep. However, the medicine makes me very drowsy if I don't sleep long enough, and driving is very dangerous if the drowsiness has not worn off.
>
> Also, if I don't take it properly I begin to deteriorate, and as you know, my vision becomes a problem.
>
> Clearly, I cannot perform the month-end task anymore. I truly do not see my errors. It is very difficult for me and problematic for you.
>
> I can finish up the month-end reports from here. What information I don't have I will email you or Michele for.

(*Id.*, Ex. 25.)

On September 8, 2005, Mr. Manno requested guidance regarding plaintiff's request to work from home. Ms. Martin responded that, "[u]nfortunately, you will need to advise [plaintiff] that she is not allowed to work from home. Even if [she] offers, we cannot allow it." (*Id.*, Ex. 37.)

On September 21, 2005, Dr. Calabrese reported that plaintiff was having severe symptoms from Sjogren's syndrome, necessitating a leave of absence "cover[ing] the date of her leave, September 5, 2005, until further notice." (*Id.*, Exs. 7 & 36). Plaintiff went on short term disability leave until March 10, 2006, when she was notified by letter that her

employment with SKF had been "terminated as the result of the elimination of your Accountant III position." (*Id.*, Ex. 34.) According to defendant, plaintiff's position was determined to be no longer needed due to the reduction in manufacturing operations at the Jamestown plant and its eventual closing (*see* Item 17-3, Manno Aff., ¶ 49).

Plaintiff filed this action on August 27, 2007,[2] seeking an unspecified amount of money damages for SKF's alleged violations of the FMLA, the ADA, and the NYHRL. Following discovery, defendant moved for summary judgment dismissing the action in its entirety, on the following grounds:

1. Plaintiff cannot establish a *prima facie* claim of age discrimination because the undisputed facts show that:

    (a) SKF engaged in an interactive process to provide plaintiff with all reasonable accommodations;

    (b) plaintiff could not perform the essential functions of her job with or without reasonable accommodations.

2. Plaintiff cannot establish a violation of the FMLA.

For the reasons that follow, defendant's motion is granted.

## DISCUSSION

**I.     Summary Judgment**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2);

---

[2]Attached to the complaint is a copy of plaintiff's "Notice of Right to Sue" letter from the United States Equal Employment Opportunity Commission ("EEOC"), dated May 30, 2007, advising plaintiff that more than 180 days had passed since the filing of her administrative charge, that the processing of her charge had been terminated, and that her ADA claim must be filed with the federal court within 90 days (Item 1, att. 1).

*see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The court's role at the summary judgment stage is not to resolve issues of fact, but rather to determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. When "little or no evidence may be found in support of the nonmoving party's case . . . [and] no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Resid. Servs., L.P.*, 22 F.3d 1219, 1223-24 (2d Cir. 1994) (citations omitted).

The Second Circuit has repeatedly cautioned the district courts about granting summary judgment to an employer in a discrimination case, especially where the employer's intent is at issue. *See, e.g., Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997); *Gallo*, 22 F.3d at 1224; *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir.), *cert. denied*, 474 U.S. 829 (1985). Nevertheless, "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact . . .," *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir.), *cert. denied*, 534 U.S. 993 (2001). The determination as to whether a disputed fact is material to the resolution of the dispute can be made "only by reference to the substantive law . . . ." *Gallo*, 22 F.3d at 1224.

**II.     The ADA**

The ADA prohibits discrimination against any "qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of

employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Claims of discriminatory discharge brought under the ADA are subject to the burden-shifting analysis established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973): the plaintiff must establish a *prima facie* case, the employer must then show that it had a legitimate, non-discriminatory reason for the discharge, and the plaintiff must then show that the proffered reason is a pretext. *Sista v. CDC Ixis North America, Inc.*, 445 F.3d 161, 169 (2d Cir. 2006).

In this case, the essence of plaintiff's ADA claim is the allegation that SKF failed to provide her with the reasonable accommodations necessary to perform the essential functions of her job. *See* Item 1, ¶¶ 40, 44; *see also Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008) (discrimination in violation of ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability. . .") (quoting 42 U.S.C. § 12112(b)(5)(A)). In order to establish a *prima facie* case of disability discrimination arising from a failure to accommodate, plaintiff must show each of the following: (1) she is a person with a disability under the meaning of the ADA; (2) SKF is covered by the statute, and had notice of her disability; (3) with reasonable accommodation, she could perform the essential functions of her job; and (4) SKF refused to make such accommodations. *McBride v. BIC Consumer Products Mfg. Co., Inc.*, 583 F.3d 92, 96-97 (2d Cir. 2009); *see also Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 184 (2d Cir. 2006). Once plaintiff has established a *prima facie* case, the burden of production shifts to SKF who must show "(a) that making a reasonable

accommodation would cause it hardship, and (b) that the hardship would be undue." *Stone v. City of Mount Vernon*, 118 F.3d 92, 96 (2d Cir. 1997), *cert. denied*, 522 U.S. 1112 (1998).

The parties do not dispute that the serious symptoms of plaintiff's Sjogren's syndrome qualify her as a person with a disability within the meaning of the ADA, or that SKF was covered by the statute and on notice of plaintiff's disability. Defendant's motion, and the court's inquiry, therefore concerns whether plaintiff has made a sufficient showing that, with reasonable accommodation, she could perform the essential functions of her cost accountant job, and that SKF failed to make the appropriate accommodations.

### A. Reasonable Accommodation

The term "reasonable accommodation" is defined in the EEOC regulations to mean:

> Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position . . . .

29 C.F.R. § 1630.2(o)(1)(ii). The ADA envisions "interactive" cooperation between the employer and the disabled employee to assess whether the disability can be reasonably accommodated. *Jackan v. New York State Dept. of Labor*, 205 F.3d 562, 566 (2d Cir.). *cert. denied*, 531 U.S. 931 (2000); *see also Thompson v. New York City Dept. of Probation*, 348 Fed. Appx. 643, 645 (2d Cir. 2009). As stated in the regulations:

> To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

29 C.F.R. § 1630.2(o)(3).

As noted in *Jackan*, courts have struggled to define the appropriate standards and burdens of persuasion to apply when, as in this case, the interactive process breaks down and the employee sues on the ground that the employer failed to provide a reasonable accommodation. To aid the analysis, the Second Circuit has established a two-step process to evaluate whether the failure to provide a requested accommodation constitutes a violation of the ADA. "First, 'the plaintiff bears the burden of proving . . . that an accommodation exists that permits her to perform the job's essential functions.' If the plaintiff meets that burden, the analysis shifts to the question whether the proposed accommodation is reasonable; on this question the burden of persuasion lies with the defendant." *Jackan*, 205 F.3d at 566 (quoting *Borkowski v. Valley Central School District*, 63 F.3d 131, 138 (2d Cir.1995)).

In this case, the vast preponderance of the evidence submitted in connection with the pending motion demonstrates that SKF at all times engaged in an interactive process with plaintiff to accommodate her concerns about her work environment. For example, when she was advised in late 2004 that the Accounting Department was being relocated, she requested permission to remain in her old office because she was able to manipulate the lighting, heat, air quality, and other environmental factors which had allowed her to work there for several years without significant flare-up of her symptoms. Mr. Manno advised her that her old office would no longer be available due to the sale, and that the new office area would provide a suitable working environment.

Shortly after the relocation of her department in December 2004, the florescent lighting in the new work space was turned off, desk lamps were provided, a cover was placed over the window near plaintiff's desk to block the lighting emanating from an

adjoining office area, and a humidifier was installed. Then, in early January 2005, plaintiff requested, and was provided, a separate office space where she could better control her environment.

In early February, in compliance with a request from Dr. Calabrese, defendant placed plaintiff on paid disability leave pending further written medical authorization to return to work "safely in an office environment with reasonable accommodation" of her condition (Item 17-7, Ex. 26). Dr. Calabrese eventually provided defendant with a list of specific accommodations, all of which were arranged for in plaintiff's private office prior to her return to work in early May. She worked without incident until early September, when she requested the further accommodation of working from home. Defendant refused this accommodation because it would not allow her to be present at the manufacturing facility during regular working hours–which, according to defendant, is one of the essential functions of her job.

### B.  Essential Functions

"Essential functions" are defined under EEOC regulations to mean "the fundamental job duties of the employment position the individual with a disability holds or desires. The term 'essential functions' does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). The interpretive guidelines accompanying the EEOC regulations instruct that in an essential function analysis, the court should first determine "whether the employer actually requires employees in the position to perform the functions that the employer asserts are essential . . . ," and if so, "whether removing the function would fundamentally alter that position." 29 C.F.R. pt. 1630 app. § 1630.2(n). The court "must give considerable

deference to an employer's judgment regarding what functions are essential for service in a particular position." *D'Amico v. City of New York*, 132 F.3d 145, 151 (2d Cir.), *cert. denied*, 524 U.S. 911 (1998), *quoted in Shannon v. New York City Transit Authority*, 332 F.3d 95, 100 (2d Cir. 2003); *see also D'Eredita v. ITT Corp.*, 2009 WL 1161618, at *10 (W.D.N.Y. 2009), *aff'd*, 2010 WL 971902 (2d Cir. March 17, 2010).

In this regard, defendant has submitted a "Job Analysis Form" for the position of "Plant 1 Cost Accountant (Accountant III–Senior Lead Accountant)" (Item 17-7, Ex. 39). This document describes in detail the essential functions of plaintiff's position, including timely and accurate analysis, preparation and review of several daily, weekly, and monthly reports (*id.* at pp. 1-7). The Job Analysis also states that the cost accountant "works closely with the director of operations, materials manager, and production control to address and resolve inventory concerns and problems." (*Id.* at p. 3.) According to defendant, most of these functions contemplate the lead accountant's presence in the facility to enable face-to-face interaction with other employees and departments during normal working hours (*see* Item 17-3, Manno Aff., ¶ 48). As stated by Mr. Manno at his deposition:

> [B]eing a cost accountant you interface with not only the materials department but also with the manufacturing floor dispatchers to correct issues that you see in the inventory.
>
> . . . .
>
> The cost accountant would review the reports and interface and go to meetings and try to understand what is happening so you can head off problems prior to them happening.

(Item 17-6, Ex. 4, pp. 31-32.)

In addition, on December 19, 2005, while plaintiff was on short-term disability leave pending medical authorization to return to work, Ms. Riley wrote to Dr. Calabrese seeking further documentation to substantiate plaintiff's ability to perform the following "major functions" of her job duties:

- Spend 6 to 7 hours daily in front of computer screen to generate reports
- Read numerical reports on computer screen
- Enter numerous rows of numbers into computer programs
- Read printed reports
- Identify and correct numerical/printed errors.

(Item 17-7, Ex. 32.) There is nothing in the record to indicate that Dr. Calabrese responded to this request prior to plaintiff's termination in March 2006.

Plaintiff does not seriously dispute the fact that she was unable to perform many of these essential functions as of the date her employment was terminated. Indeed, the record reflects that both plaintiff and Dr. Calabrese acknowledged plaintiff's inability to do so. As discussed above, plaintiff advised Mr. Manno by email on September 5, 2005 that she could not come to the office to work while she was taking the medications necessary to allow her to cope with her illness, and that "[c]learly, I cannot perform the month end tasks anymore. I truly do not see my errors. It's very difficult for me and problematic for you." (Item 17-7, Ex. 25.) Moreover, Dr. Calabrese's progress notes from an office visit on October 26, 2005 reflect that plaintiff was unable to "sit in front of a computer because of eye irritation" (*id.*, Ex. 40). His impression was that plaintiff demonstrated "peculiar intolerance of chemicals (including industrial and cologne) as well as industrial lights and computer lights. I have nothing to offer to reduce these [symptoms]." (*Id.*) His notes from a subsequent office visit on May 31, 2006, following her discharge, report that plaintiff

remained "extremely photosensitive–gets diffusely weak; this also occurs with fluorescent lights; TV; computer . . . I have not seen this degree of subjective photosensitivity and I have no remedy for it" (*id.*).

Based on this review of the record, and giving appropriate deference to defendant's judgment regarding the functions of the position of senior lead accountant, the court concludes that requiring plaintiff to be present at the manufacturing facility during regular working hours is an essential function of her job, and that accommodating her request to work from home would fundamentally alter the position. Plaintiff has therefore failed to come forward with a sufficient *prima facie* showing that working from home was a reasonable accommodation which would have permitted her to perform the job's essential functions.

The same is true with respect to plaintiff's request to remain in her old office on the third floor. For one thing, the employer's determination that the sale of the building rendered the third floor space unavailable, that the accounting team should remain together, and that the new space would provide a suitable environment to accommodate plaintiff's medical condition is entitled to due deference. In addition, the undisputed evidence in the record shows that the employer took every reasonable step to ensure that the medically documented accommodations were provided in the new location, including a private office with full environmental control.

Accordingly, no rational juror could find in favor of plaintiff on her claim of disability discrimination arising from a failure to accommodate, and defendant is entitled to summary judgment as a matter law dismissing the complaint to the extent it seeks relief under the ADA.

III.    **NYHRL**

Because "the same analysis of plaintiff's *prima facie* case applies to both her ADA and NYHRL claims . . .," *DeNardi v. DRA Imaging, P.C.*, 605 F. Supp. 2d 550, 557 (S.D.N.Y. 2009), plaintiff's failure to establish a *prima facie* case of disability discrimination arising from a failure to accommodate requires dismissal of her NYHRL claims as well. *See Sclafani v. PC Richard & Son*, 668 F. Supp. 2d 423, 440 n.10 (E.D.N.Y. 2009) (relevant legal standards for discrimination claims brought under ADA and NYSHRL are essentially the same).

Accordingly, defendant is entitled to summary judgment as a matter law dismissing the complaint to the extent it seeks relief under the NYHRL

III.    **The FMLA**

Plaintiff also claims that SKF terminated her employment in retaliation for her use of leave time to which she was entitled to under the FMLA, in violation of 29 U.S.C. § 2615(a)(1). To establish a *prima facie* case of retaliation in violation of the FMLA, plaintiff must demonstrate that (1) she exercised rights protected under the FMLA, (2) she was qualified for her position, (3) she suffered an adverse employment action, and (4) the action occurred under conditions giving rise to an inference of retaliatory intent. *DiCara v. Connecticut Rivers Council*, 663 F. Supp. 2d 85, 96 (D. Conn. 2009) (citing *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004).

Here, the undisputed facts are that plaintiff was granted disability leave by the employer on each occasion that it was requested, and plaintiff has failed to come forward

with any proof to suggest that her discharge occurred under circumstances giving rise to an inference of retaliation for the exercise of her right to disability leave. Indeed, plaintiff has not responded to defendant's request for summary judgment in this regard, and has apparently abandoned her FMLA claim.

Accordingly, defendant is entitled to summary judgment dismissing the complaint to the extent it seeks relief under the FMLA.

## **CONCLUSION**

For the foregoing reasons, defendant's motion for summary judgment (Item 17) is granted, and plaintiff's complaint is dismissed in its entirety. The Clerk of the Court is directed to enter judgment in favor of defendant.

So ordered.

 \s\ John T. Curtin
JOHN T. CURTIN
United States District Judge

Dated: July 29, 2010
p:\pending\2007\07-563.jun22.10